Christian Leigh **CURRY**, Plaintiff,

v.

**MORGAN STANLEY & CO.,**
**et al., Defendants.**

No. 99–Civ.–4035(DC).

United States District Court,
S.D. New York.

April 24, 2000.

---

**22.** Houthakker Aff. ¶ 10.

**23.** *NASDAQ,* 169 F.R.D. at 527.

**24.** *See* FED. R. CIV. P. 23(c)(1).

Benedict P. Morelli & Associates, P.C., By: Benedict P. Morelli, David S. Ratner, Jason R. Corrado, New York City, for Plaintiff.

Paul Weiss Rifkind Wharton & Garrison, By: Martin London, Richard A. Rosen, New York City, for Defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

In this employment discrimination case, plaintiff Christian Leigh Curry contends that defendant Morgan Stanley & Co. ("Morgan Stanley") unlawfully discharged him from his position as a first-year analyst in its real estate department because of his race and "perceived sexual orientation." (Am. Cmplt.¶¶ 18–22). Morgan Stanley denies that it discriminated against Curry and argues instead that it fired him because he engaged in repeated expense account fraud. Indeed, the answer to the amended complaint charges that Curry "stole money from his employer by submitting fraudulent expense account reimbursement claim forms to the firm." (Answ. to Am. Cmplt. ¶ 2).

By letter to the Court dated March 24, 2000, Curry renews his request for an order requiring defendants to produce expense records for the individual defendants, each of whom is or was a senior executive of Morgan Stanley. The Court has twice declined to grant the request, but Curry continues to press the issue. He now presents what he contends is "concrete evidence" that Curry's "peers" at Morgan Stanley—who purportedly went unpunished—engaged in the same behavior for which Curry was fired. On the basis of this purported "concrete evidence," Curry seeks the expense records of the individual defendants so that he can prove the existence of what he describes as a "corporate culture" that "permitted," indeed "encouraged," expense account fraud. (Pl. 3/24/00 Letter at 1, 12).

For the reasons that follow, Curry's renewed request is denied.

## BACKGROUND

### A. The Discovery Dispute

The issue of the discoverability of the individual defendants' expense records was first raised with the Court at a pretrial conference on October 12, 1999. Curry had served a request for the production of expense reports for six of the named individual defendants even though he had not yet requested the records for the "junior analysts" in Curry's department. (10/12/99 Tr. at 16–18). Morgan Stanley objected to the request for the individual defendants' expense records. (*Id.* at 18). I ruled that Curry was entitled to production of the expense records for first- and second-year analysts in the real estate department for the same time period that Curry was employed at Morgan Stanley. I further stated that if the expense records for these individuals showed that "Mr. Curry [was] doing nothing differently from everyone else on his level," then I would consider ordering the production of expense records for the individual defendants. (*Id.* at 19–20).

The issue was raised with the Court again at a conference on December 15, 1999. Counsel for Curry contended that the expense records for the junior analysts showed a "widespread" pattern of abuse:

> [W]e are talking about many, many of the bankers. There are abuses of meal expenses, where they have gone to a grocery store and b[ ]ought groceries, a leg of lamb and other groceries, $29 worth, $30 worth and expensed as a meal. There were items listed as miscellaneous. There were things bought at Coach, where they bought picture frames and not only were reimbursed for them, noting that they were miscellaneous, but reimbursed two times for the same item, so they submitted them twice. Sometimes they were submitted by the Amex bill and then later on by the bill itself, or sometimes the same bill was submitted identically twice. . . .
>
> .    .    .    .    .
>
> One of the junior bankers for a month had $50,000 in charges. And, your Honor, we are talking about greens fees, ski trips,

thousands of dollars in cigars. All right? And if that's not a pattern, if that's not irregular, then I don't know what irregular is.

(12/15/99 Tr. at 28–29). I asked counsel to make a written submission to provide a "few examples" so that I could get a better idea of the problem, and I gave defendants an opportunity to respond. (*Id.* at 29–30).

Thereafter, the parties made written submissions. Curry provided examples of alleged abuse by his co-workers. Defendants submitted a letter, with eighty-two exhibits, providing explanations for the examples and providing details as to the alleged abuse by Curry.

I met with the parties again on February 18, 2000. Ruling from the bench, I denied Curry's request for the expense reports of the individual defendants. (2/18/00 Tr. at 7). I did so because Curry had not demonstrated a widespread pattern of abuse as he had alleged and because the issues presented by Curry's alleged abuse were "significantly different." (*Id.* at 7–8). As I advised the parties, I concluded that Curry had not demonstrated a basis for obtaining the records for individuals who were not comparably situated. (*Id.* at 9).

Curry's attorneys continued to press the issue, asking for an opportunity to submit further examples. (*Id.* at 10). I advised counsel that if they wished to make another submission, they could do so, but I stated that I was going to review the records first, before requiring a response from defendants. (*Id.* at 11).

Curry's counsel's March 24, 2000 letter followed. With it came four exhibit volumes and some 195 exhibits.

## B. *The Expense Reports*

I have reviewed the voluminous expense records submitted by both sides, both for Curry and for the other first and second-year analysts in the real estate department at Morgan Stanley. I discuss first Curry's records and then the records of the other analysts.

### 1. *Curry*

Defendants report that Curry submitted 450 receipts for $16,106 in expenses for which he sought reimbursement.[1] As Curry was employed by Morgan Stanley only for some nine months, this averages to 1.67 receipts per day—even assuming Curry worked every single day, including weekends and holidays, for the entire nine months. In addition, the receipts show that Curry claimed reimbursement for $11,940.03 in overtime meals during that same nine-month period, which, according to defendants, is more than double the average for overtime meals claimed by other analysts.

More significantly, the documentation reviewed by the Court strongly suggests that Curry engaged in a pattern of deceit. The documentation suggests that he altered documents, that he fabricated documents, that he submitted the same meals for reimbursement twice, and that he represented that items were reimbursable overtime meals when they in fact were purchases of personal merchandise.

For example, Curry submitted a receipt from FAO Schwarz, a toy store, for the purchase of a $99 teddy bear and claimed it as an overtime meal. (Def. 1/31/00 Letter, Ex. 1). The top of the printed credit card receipt is torn off, apparently to hide the fact the receipt was from a toy store. In addition, a $20 tip is added in handwriting and the names of five of Curry's co-workers who purportedly shared in the meal are written on the back of the receipt. At his deposition, Curry acknowledged that in fact he purchased a bear at FAO Schwarz, apparently for his girlfriend, and submitted the receipt to Morgan Stanley for reimbursement as a meal. (*Id.*, Ex. 6, at 388–89, 392–93). Curry obtained reimbursement not only for the cost of the bear and sales tax ($99.00 plus $8.17 for a total of $107.17), but also for a $20 tip that he never paid.

Curry submitted a credit card receipt for $98.11 from a place called "Lots of Linens" for reimbursement as an overtime meal. (*Id.*, Ex. 3). At his deposition, Curry acknowledged that the receipt in fact was for

---

1. Curry contends that it was only $14,182. (*See*     Pl. 1/5/00 Letter at 1).

linens that he purchased for his personal use. (*Id.*, Ex. 7, at 283–84).

Curry also submitted a receipt from Virgin Megastore, a music and electronics store, for reimbursement as an overtime meal. (*Id.*, Exs. 4, 8). The credit card receipt is for $16.22; Curry wrote in a $4.00 "tip" and a total of $20.22. Curry apparently purchased merchandise at the music store, added on a "tip," and submitted the credit card receipt for reimbursement as an overtime meal.

Curry also submitted for reimbursement as an overtime meal a credit card receipt for January 12, 1998 from a restaurant, Blakes/Huxley. (Def. 1/31/00 Letter, Ex. 10). The receipt is for $40.75 and Curry added, in handwriting, a tip of $5.00 and wrote in a total of $45.75. He also submitted for reimbursement as an overtime meal a restaurant receipt from the same establishment for "1/13" for $40.75. (*Id.*). The two receipts apparently are for the same meal: On the restaurant receipt the "1/13" appears to be written in a different handwriting from the rest of the receipt. In addition, the handwritten "$5.00" and "$45.75" from the credit card receipt have bled through onto the restaurant receipt. In other words, Curry submitted the same meal to Morgan Stanley for reimbursement twice.

Curry submitted to Morgan Stanley for reimbursement as an overtime meal a cash register receipt from Z Deli for August 4, 1998 for $15.04. As Curry acknowledged at his deposition, however, he submitted the credit card receipt for the same meal for reimbursement the following month as well. (*Id.*, Ex. 11 at 190–92). Defendants contend that additional records (which have not been submitted to the Court) show that Curry was "doubly" reimbursed for the same meal approximately fifty times. (*Id.* at 4).

Curry also submitted for reimbursement as overtime meals a number of receipts that he had written himself from a pad of blank restaurant "Guest Checks." (*Id.*, Ex. 12; *see also id.*, Ex. 13). The receipts (or checks) do not have the name of any establishment printed on them; two have the name "Koronet" or "Koronet Restaurant" written in by hand. (*Id.*, Ex. 12). Curry acknowledged that although one of the receipts for "Koro-net Restaurant" listed a bottle of Zinfandel, the Koronet Restaurant, which is actually a pizzeria, does not sell Zinfandel. (*Id.*, Ex. 13 at 175). Curry also acknowledged that he did not actually receive the guest check at the Koronet Restaurant. (*Id.*, Ex. 13 at 178).

## 2. The Other Analysts

Curry submitted information for other analysts on three occasions: first, by letter dated January 5, 2000; second, by letter dated February 3, 2000; and third, by letter dated March 24, 2000.

### a. The First Submission

The first submission identified numerous alleged abuses. In their response, however, defendants demonstrated that the vast majority of these examples were not improper at all. For example, although many of the analysts did submit grocery store bills for reimbursement as overtime meals, Morgan Stanley's policy permitted this. (Def. 1/31/00 Letter at 5). Moreover, no effort was made to hide the fact that the receipts were from grocery stores, nor were any "tips" added to grocery store receipts. One grocery store receipt does indeed show a "leg of lamb," an item referred to by Curry's counsel at the December 15, 1999 conference. (*Id.*, Ex. 19). But the analyst in question sought reimbursement only for $25.00, although the receipt was for $73.36 worth of groceries. (*Id.*). In other words, the analyst in question purchased $73.36 worth of groceries and charged $25.00 of that amount to Morgan Stanley for her overtime meal.

There are numerous other examples in the first submission of alleged abuse as to which Curry's counsel simply is in error. One analyst purchased videotapes, including "How The Grinch Stole Christmas." But as the receipts and accompanying expense report show, the videos were purchased for a Christmas video for the office party. (*Id.*, Exs. 25, 26). The receipts were not submitted as overtime meals, nor were "tips" added to them. Expense reports and receipts for seemingly personal items from places such as the Sports Authority (sports equipment), Coach (picture frames), and Paragon (sports

equipment) show that the items were gifts to be given at closings. (*Id.*, Exs. 31–32, 45, 74). Again, no effort was made to disguise these purchases of merchandise as overtime meals. One analyst was indeed reimbursed for $24,336.41 for a ski weekend, but as the records show, she paid for all the rooms, meals, ski tickets, etc. for what was described as a "closing retreat" that included representatives of the client, Morgan Stanley personnel, and lawyers from an outside law firm. (*Id.*, Ex. 70).

In the end, what Curry's counsel described as a "thorough review and analysis of the expense account records of the twenty-four (24) analysts who are considered plaintiff's contemporaries at Morgan Stanley" (Pl. 1/5/00 Letter at 1) revealed at worse a few scattered and very minor errors. There certainly was no wide-spread pattern of abuse, and there was nothing submitted to the Court similar to the apparently deceitful conduct engaged in by Curry.

Although the records were not submitted to the Court, defendants note that one analyst did submit numerous receipts with "intentional alterations and bogus reimbursement requests." (Def. 1/31/00 Letter at 9). According to defendants, she was fired a few months after Curry was fired, and "long before" this lawsuit was commenced. (*Id.*).

#### b.  *The Second Submission*

After defendants responded in great detail to Curry's first submission, Curry submitted a second letter, on February 3, 2000, purporting to provide three further examples of alleged abuse as well as examples of occasions when one analyst claimed that a co-worker was present for the meal when a different analyst claimed that the same co-worker was present at a different meal on the same date.

Two of the three purported additional examples in fact did not involve anything improper. Curry pointed out that one analyst submitted numerous grocery store receipts. (Pl. 2/3/00 Letter at 1 & Ex. C). Again, Morgan Stanley's policy permitted analysts to be reimbursed for overtime meals consisting of food purchased from a grocery store.

In addition, all the receipts were for approximately $25, the limit for an overtime meal.

In addition, Curry claimed that one analyst submitted the same $97 meal twice. (Pl. 2/3/00 Letter at 2 & Ex. F). In fact, the analyst did submit the same receipt twice, but he did so because he charged the meal to two different accounts; one account was charged $50 and the other $47 for a total of $97. As the records show, he did so because three other analysts shared the meal with him, and two of them apparently worked on one matter while the other two worked on a different matter. (*Id.*; *see also* Def. 2/7/00 Letter at 2 & Ex. A). Curry also noted that the same analyst submitted two receipts from Coach for the same date in the same amount. (Pl. 2/3/00 Letter at 2 & Ex. E). The receipts clearly show, however, that the analyst made two separate purchases of $292.28 each and that the items were gifts for the client. (*See* Def. 1/31/00 Letter, Ex. 45).

The third example does appear to show an analyst submitting the same meal for reimbursement twice. (*See* Pl. 2/3/00 Letter at 2 & Ex. G).

#### c.  *The Third Submission*

In his third submission, Curry submits further examples of a problem he identified in the second submission: analysts listed as being present for an overtime meal who submitted their own receipt or who are listed on a different analyst's receipt for a meal the same day or who could not have been present when the claimed meal was present. In addition, Curry sets up five categories of expense account abuse and purports to tally each time each analyst engaged in a particular category of abuse. He contends that this analysis shows that every analyst engaged in expense account abuse and that some analysts did so as many as 23, 32, 39 and 56 times. (Pl. 3/24/00 Letter at 10–11).

As noted, Curry submitted four exhibit volumes and some 195 exhibits. I did not require a response from the defendants (as this was plaintiff's third submission), and thus I do not have the benefit of their input. Nor did I take the time to review all 195 exhibits. I did review many of them, howev-

er, and the ones I reviewed were not, on their face, problematic. I discuss a few by way of example:

· Curry contends that Analyst A[2] submitted the same receipt for $37.50 for an overtime meal twice. As the receipt and the expense reports show, however, Analyst A split the meal between two accounts, charging half ($18.75) to one account and half ($18.75) to a second account. (Ex. A2). Although the total of $37.50 exceeds the $25 per meal limit, the records show that ·another analyst shared the dinner; hence, each analyst spent only $18.75, and the amount was billed to two different accounts because the two analysts apparently were working on different matters. (A2 at 5559, 5542).[3]

· Curry contends that Analyst A listed as "lunch" a 12:52 a.m. receipt from the Ludlow Bar on January 20, 1998, for which reimbursement in the amount of $25.00 was claimed. In fact, the expense report shows two overtime meals for 1/20/98, but neither is described as "lunch." (Ex. A9 at 7823, 7824). Nor is the fact that two overtime receipts were submitted for January 20, 1998 in itself a problem; the one for 12:52 a.m. could have been an overtime meal for the workday that began on January 19, 1998.

· Curry contends that Analyst A submitted a receipt for an overtime meal on January 20, 1998 listing Analyst I when Analyst I purportedly submitted his own receipt. First, the receipt in question was for $72.50; Analyst A only sought reimbursement for $25.00. (Ex. A9 at 7823, 7827). Curry has not submitted the documentation to show that Analyst I was listed, but even assuming he was, as Analyst A only sought reimbursement for his own meal (and not Analyst I's meal), there was nothing improper here. Second, in any event Analyst I's records do not show that Analyst I ever sought reimburse-

ment for an overtime meal on January 20, 1998. (*See* I7–I10) (showing no requests for reimbursements for January 20, 1998).

· Curry complains that Analyst D submitted the same receipt for a meal five times. (*See* Ex. D face sheet). In fact, the documentation clearly shows that the charge of $101.78 was split among five different accounts: $20.36 to account 8C70–001; $20.36 to account 8315–005; $20.36 to account $9500–005; $20.35 to account 89M7–001; and $20.35 to account 89D2–002, for a total of $101.78. (*Id.*, Ex. D at 5233, 5236, 5242). In addition, the same records show that the bill was split among five different accounts because five different analysts shared the meal.

· Curry complains that Analyst E submitted two receipts for July 21, 1997 for overtime meals in the amounts of $18.25 and $18.39 for a total in excess of $25.00, the limit for an overtime meal. (Ex. E face sheet, citing Ex. E1 at 3265, 3259, 3305, 3302).[4] The receipt for $18.25 for July 21, 1997, however, shows that it was issued at 12:34 a.m. (Ex. E1 at 3265). That would suggest that it was an overtime meal for the workday that began on July 20, 1997, and if that were the case, the analyst would have been entitled to submit two receipts for July 21, 1997.

Curry's third submission is also problematic because the Court is unable even to follow many of his assertions. Although Curry has submitted four volumes of exhibits, in many instances the documentation for the alleged problem either does not exist or has not been submitted. For example,

· In the very first example in plaintiff's first chart, Analyst C is alleged to have submitted a receipt for a meal on July 10, 1997 with Analyst A, who is alleged to have submitted his own receipt. (Pl. 3/24/00 Letter at 3). The 17 sets of exhibits for Analyst C, however, do not show that he requested reimbursement

---

**2.** Instead of using the analysts' names, I use the letter assigned to each analyst in plaintiff's exhibit volumes. References to exhibits are to the exhibits contained in the exhibit volumes.

**3.** References to the four-digit numbers following the exhibit numbers are to the Bates numbers stamped on the documents.

**4.** Plaintiff writes 1999 but he clearly means 1997.

for a meal on July 10, 1997. (Exs.C1–C17). Nor, for that matter, do the exhibits for Analyst A show that he sought reimbursement for a meal on July 10, 1997. (Exs.A1–A17).

· Likewise, plaintiff alleges that Analyst P submitted a receipt for a meal on October 28, 1997 with Analyst E when the latter submitted his own receipt. (Pl. 3/24/00 Letter at 4). No such documentation, however, was submitted for Analyst P. (*See* Exs. P1–P4). Moreover, although documentation is submitted to show that Analyst E obtained reimbursement for two meals on October 28, 1997, the documentation shows that he only requested reimbursement for $25.00 for each meal. (Ex. E4 at 3342). For one of those meals, Analyst E submitted a receipt for $50.00 but claimed only $25.00; both the receipt and the expense report show that the meal was split with Analyst F. (*Id.* at 3343, 3344). The other receipt was for $25.00. Although there are two receipts for the same date, one receipt shows that it was for 12:37 a.m., which would suggest it was for an overtime meal for the workday that began on October 27, 1997. In that event, it would not have been inappropriate for the analyst to seek reimbursement for both meals.

In short, Curry's allegations of a widespread pattern of expense account abuse simply do not withstand scrutiny. In the vast majority of the purported examples, Curry has misread the documents or ignored explanations that are apparent from the face of the documents or mischaracterized the situation. Errors can be found, but nowhere to the extent he alleges. There was a ski trip; but it was a closing retreat attended by the analyst, her supervisors, representatives of the client, and outside attorneys. There was the purchase of merchandise, such as videos and Coach picture frames, but these were for Morgan Stanley business—an office party

and closing gifts. There was a leg of lamb, but it happened to be on a receipt for $73.36 in groceries for which the analyst sought reimbursement for only $25.00. Significantly, there are no examples in the voluminous records of another analyst who, for example, purchased merchandise for personal use, added a "tip" to the receipt, and then submitted it for reimbursement as an overtime meal.

## DISCUSSION

Curry's renewed request for the expense· records of the individual defendants is denied.

First, Curry was not "similarly situated" to the individual defendants. In an employment discrimination case, a plaintiff may prove discrimination by, among other things, showing that similarly situated co-workers were treated differently. Even an employee who has been discharged for misconduct may show discrimination by demonstrating that similarly situated employees outside the protected category were not disciplined for similar misconduct. Here, however, Curry was a first-year analyst in the real estate department. In contrast, the individual defendants include the Chairman and Chief Executive Officer, the President and Chief Operating Officer, and the former Chief Legal Officer of Morgan Stanley Dean Witter, and other current or former managing directors or other executives. Curry is simply not similarly situated to them, and their expense account practices can have no bearing on whether Curry was properly dismissed for expense account abuse.[5]

Second, Curry has not demonstrated any basis·for further discovery in this respect on the basis of a "corporate culture" theory. The existence or non-existence of a corporate culture at Morgan Stanley that tolerated expense account abuse is arguably relevant.[6]

---

**5.** *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567–68 (2d Cir.2000) (holding that Hispanic employee who was fired for misconduct did not present sufficient evidence of pretext because she failed to show that non-Hispanic employees who were not disciplined were "similarly situated" to her; *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997) (to show discrimina-

tion based on disparity in disciplining employees for misconduct, plaintiff had to show that other employees were similarly situated).

**6.** *See Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 54 (3d Cir.1989) ("When a major company executive speaks, 'everybody listens' in the corporate hierarchy...."); *see also Josey v. John*

Despite being given three chances, however, Curry has not presented any concrete evidence of the existence of such a corporate culture at Morgan Stanley. Indeed, he and his counsel have made outlandish, inflammatory claims that they simply have not been able to support, and the alleged wide-spread pattern of abuse simply does not exist.

Third, the few scattered problems that can be found are not comparable in nature or degree to the actions taken by Curry. Thorough reviews of the expense records of the similarly situated first-year analysts and arguably similarly situated second-year analysts have uncovered nothing comparable to the conduct engaged in by Curry—submission of a receipt for a teddy bear as an overtime meal, tearing off the top of the receipt to eliminate the name of the establishment, adding fictitious "tips" to receipts for merchandise, and fabricating restaurant receipts.[7] According to defendants, the one other analyst who engaged in comparable conduct—whose records were not among those submitted by plaintiff to the Court—was also dismissed.

Finally, whatever remotely probative value the expense records of the individual defendants could offer is overwhelmingly outweighed by the danger of unfair prejudice, confusion, delay, and waste of time. Many hours have already been expended on this issue, and Curry simply has not demonstrated any reason for permitting any further effort in this respect.

### CONCLUSION

Curry's renewed request for the production of the expense records of the individual

defendants is denied. The Court will not entertain any further such applications.

SO ORDERED.

*R. Hollingsworth Corp.*, 996 F.2d 632, 641 (3d Cir.1993) ("The court may also consider as circumstantial evidence the atmosphere in which the company made its employment decisions."); *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir.1987) ("[C]ircumstantial evidence of a discriminatory atmosphere at a plaintiff's place of employment is relevant to the question of motive in considering a discrimination claim.").

7. See *Mazzella v. RCA Global Comm., Inc.*, 642 F.Supp. 1531, 1547 (S.D.N.Y.1986) ("Employees are not 'similarly situated' merely because their

conduct might be analogized. Rather, in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it."), *aff'd mem.*, 814 F.2d 653 (2d Cir.1987).